jar

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

|                                    |   |
|------------------------------------|---|
| UNITED STATES OF AMERICA,          ) |
|                                    ) |
| Plaintiff,                         ) |
|                                    ) Case No. 10-40092-JAR |
| vs.                                ) |
|                                    ) |
| RAMON OROZCO,                      ) |
|                                    ) |
| Defendant.                         ) |
|                                    ) |

## MEMORANDUM AND ORDER

This matter comes before the Court upon defendant Ramon Orozco's Motion to Suppress (Doc. 20). Defendant moves to exclude any information or evidence derived from the search and seizure of defendant or the vehicle he was driving at the time of a traffic stop by law enforcement. Defendant challenges the legality of the initial traffic stop, on the basis that there was no reasonable suspicion supporting a stop of the vehicle for following another vehicle too closely, as well as the voluntariness of his consent to search and the legality of his detention. The Court has thoroughly considered the parties' briefs and the evidence presented at the February 28, 2011 hearing on this motion, and is now prepared to rule. For the reasons stated below, defendant's motion is denied.

**I.     Factual Background**

Based on the testimony and evidence admitted at the hearing on this motion, the Court finds as follows. On August 28, 2010, Sergeant Mark Maschmeier of the Geary County, Kansas, Sheriff's Department was patrolling eastbound on Interstate 70 at approximately milepost 308,

when he noticed a semi tractor-trailer ("truck") also traveling eastbound on Interstate 70. The road was straight, with moderate hills and there were no remarkable weather or road conditions. Sergeant Maschmeier noticed the truck because, in his observation, it was following another truck too closely. Interstate 70 has two eastbound lanes; the two trucks were in the right eastbound lane. As Maschmeier began to follow them, he was driving in the left eastbound lane about two to three car lengths behind the second truck. Using the milepost markers as his guide, Maschmeier determined that the second truck was less than two seconds behind the first truck. This "two-second" rule is one employed by Maschmeier to determine whether a vehicle has sufficient distance between the vehicle in front of it to allow it to safely stop if necessary. Moreover, Maschmeier testified, under Kansas law, two trucks traveling in tandem must have sufficient space between them to allow a car to safely maneuver into the lane between them. But, Maschmeier observed that the second truck was following the first truck too closely to allow for a car to safely maneuver in between them.

Over the course of four miles, Sergeant Maschmeier continued to observe the second truck following the first truck too closely. Several times he observed the second truck pull close to the first truck, yet it never signaled or evidenced an intent or attempt to pass the first truck. Maschmeier observed the trucks, as they traveled in the right hand lane and he traveled in the left hand lane, some two to three car lengths behind the second truck. Although Maschmeier remained in the left lane the entire time, he testified that he pulled back periodically, which would have allowed the second truck sufficient space to pass the first truck without impediment.

Sergeant Maschmeier decided to stop the second truck for following too closely. He activated his lights, which in turn activated the video recording equipment in the patrol car, and

2

effected the stop at milepost 312. The video recording remained on during the duration of the stop; the audio recording equipment failed to operate or record anything.

Sergeant Maschmeier first called dispatch to run a check on the license tag. Next, Maschmeier exited his patrol car, and approached the truck on the passenger side, making contact with defendant, who was driving the truck, through the open passenger side window. Maschmeier asked if the door opened; defendant opened the passenger side door. Maschmeier asked defendant for his driver's license and logbook. Defendant produced a California driver's license bearing his name, "Ramon Orozco," and a logbook. Maschmeier asked defendant why he did not pass the first truck; defendant responded that he did not have enough time. Maschmeier asked defendant his travel plans, origination and destination. Defendant responded that he was delivering a load of shopping carts from Phoenix, Arizona to Augusta, Georgia. The door of the truck cab bore the company name, RO Trucking, of Maywood, California. This prompted Maschmeier to ask defendant why he was taking such a northern route. In a short series of questions and answers, defendant advised that he had made a trip to Denver for a couple of hours to visit his family. When Maschmeier asked him what family, defendant hesitated before responding that it was his father. Defendant went on to explain that his father was sick, and provided some detail about how ill his father was. Maschmeier observed that during this entire discussion, defendant exhibited extreme nervousness. His hands shook when he handed documents to Maschmeier, and his voice quivered.

Next, Sergeant Maschmeier took the driver's license and logbook back to his patrol car for further checking. As he walked back to his patrol car, he noticed "ghosting," that is, the former trucking company's name had been washed off the trailer. He also noticed that the

Department of Transportation number for the trailer was high, signifying that it was a new registration. Maschmeier also noticed something he considered unusual for a newly acquired truck: it was outfitted with new tires, new chrome, new mirrors, front end, turn signals and bumper. In Maschmeier's experience, it was unusual for a new owner to have the funds to spend on such upgrades, after having expended money to purchase the truck.

As Sergeant Maschmeier waited in his patrol car for dispatch's response to a records check on defendant's driver's license and logbook, he spoke to another Sheriff's Officer, Corporal Eric Coffman. Coffman decided to join Maschmeier at the scene based on Maschmeier's description of his observations of defendant and defendant's truck. In addition to describing what defendant reported about his travel plans and defendant's nervous demeanor, Maschmeier told Coffman about his observations that this was a newly acquired truck with the above described upgrades. Maschmeier further advised Coffman of something else that piqued his suspicion—defendant's logbook indicated that he had spent two days at a truck stop in Ontario, California about two to three days before the stop. This was curious because defendant said he lived in Maywood, California, in the same region of California. Further, Maschmeier knew that this truck stop in Ontario, California was a location known to law enforcement as a loading and distribution point for drug trafficking.

Before Corporal Coffman or any other law enforcement officers arrived, dispatch responded to Sergeant Maschmeier, advising that defendant's California driver's license was valid. Maschmeier then walked back to the truck to return the driver's license and other documents to defendant. Before handing the documents to defendant, Maschmeier asked why he had spent two days downtime at the truck stop in Ontario. In a series of questions and answers,

defendant advised that the truck stop was only forty-five minutes from his house, and although there were truck stops closer to his residence, none of them was any good.

Sergeant Maschmeier handed the documents back to defendant, and orally warned him that he needed to keep a safe distance between his truck and other vehicles. Defendant responded that he would drive safely. Maschmeier told defendant he was free to go, and again told him to drive safely. At this point, the traffic stop had lasted about fifteen minutes.

Sergeant Maschmeier stepped down off the running board on the passenger side of the truck and began to close the passenger door. Before the door was fully closed, Maschmeier said to defendant, "knowing that you are free to go, would you mind answering a few more questions?" Defendant responded yes. Maschmeier then asked defendant if he had illegal contraband, large amounts of money, narcotics or weapons. Defendant responded no, that all he had was water in a cooler by his seat. Maschmeier then asked defendant if he minded if he searched the vehicle. Maschmeier observed that defendant's nervousness increased, and defendant said yes. Maschmeier testified that defendant stuttered and had some trouble articulating the word yes, yet he definitely said yes.   Throughout the entire traffic stop and in all conversations, defendant spoke English without any apparent difficulty in comprehension or articulation. He never indicated he had problems understanding or communicating with Maschmeier or others in English.

At Sergeant Maschmeier's request, defendant alighted from the truck. Maschmeier asked defendant if he could pat him down for weapons; defendant said yes. While patting him down, Maschmeier observed and felt that defendant's whole body was trembling. Determining that defendant had no weapons on his person, Maschmeier had defendant stand by the front of the

5

truck as Maschmeier searched the cab of the semi. This search yielded nothing at that time; Maschmeier testified that he intended to do a more thorough search once the other law enforcement officers arrived.

Sergeant Maschmeier asked defendant if he had anything in the trailer. Maschmeier testified that at this point defendant did not appear nervous, and seemed "almost happy," handing Maschmeier the keys to the trailer. When Maschmeier and defendant walked to the back of the trailer, they found Corporal Coffman standing there, having just arrived at the scene. Maschmeier briefed Coffman, telling him he believed there was something in the cab. While Maschmeier searched the trailer, Coffman waited with defendant until a third law enforcement officer, Kansas Highway Patrol Trooper Jodi Wolf, arrived. In fact, from the time Maschmeier began searching the trailer, defendant was in the continual presence of law enforcement. After Maschmeier and Coffman, three other law enforcement officers arrived; there were a total of five law enforcement officers on the scene before the roadside search was concluded.

When the trooper arrived at the scene, Corporal Coffman began a more thorough search of the cab. Sergeant Maschmeier found nothing in the trailer. Maschmeier then walked up to the cab. Coffman pointed out to Maschmeier an atypical void in the ceiling of the sleeping area of the cab, which appeared to be two feet lower then the top of the cab. Maschmeier, who was standing outside of the cab could see the lower ceiling. When Maschmeier looked at the difference of the ceiling height and the roof of the cab, he determined that the difference was more than two feet. Further, the officers could see that the screws on the ceiling panel evidenced fresh tool marks. The officers removed the panel, and found a trap door to a compartment in which they observed what appeared to be bundles of marijuana. Defendant was then placed

under arrest and transported to the Geary County Sheriff's office. The entire duration of the stop and roadside search was no more than fifty minutes. The officers seized eighty-seven bundles of marijuana, weighing a total of 832 pounds.

## II. Discussion

Defendant challenges the validity of the initial stop. He also challenges the consent to search, arguing it was the product of an illegal detention, and further that his consent was not voluntary but coerced.

### *Initial Stop*

"'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'"[1] The principles of *Terry v. Ohio*[2] apply to such traffic stops. Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[3] Tenth Circuit cases establish that "a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile."[4] Moreover, a reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.[5]

---

[1] *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)).

[2] 392 U.S. 1 (1968).

[3] *Id.* at 19–20.

[4] *United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993).

[5] *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

Sergeant Maschmeier stopped defendant's truck because of his reasonable suspicion that the vehicle had followed another vehicle too closely, a moving traffic violation committed in his presence. K.S.A. 8-1523 provides in pertinent part:

> (a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.
> (b) The driver of any truck or motor vehicle drawing another vehicle when traveling upon a roadway outside of a business or residence district and which is following another truck or motor vehicle drawing another vehicle shall leave sufficient space, whenever conditions permit, so that an overtaking vehicle may enter and occupy such space without danger, except that this shall not prevent a truck or motor vehicle drawing another vehicle from overtaking and passing any vehicle or combination of vehicles.[6]

Over a distance of four miles, Maschmeier observed the second truck apparently following the first truck too closely, allowing less than two seconds between the vehicles, and not allowing sufficient space such that a car could safely maneuver and travel between the two trucks. Although Maschmeier traveled solely in the left passing lane, he followed from a distance of two to three car lengths behind and did not impede the second truck from passing the first truck. Thus, there was reasonable suspicion supporting and justifying the initial stop of the vehicle.

Having stopped the truck, Sergeant Maschmeier appropriately requested a records check on the license tag, inquired of defendant's travel plans, and requested a records check on defendant's drivers license and other documents. Defendant argues that in this situation, having observed an apparent moving violation in his presence, there was no further investigative purpose to be served after the officer stopped the vehicle. Presumably, defendant argues that the officer should have done nothing more than give him a ticket. But, in all respects, Maschmeier's

---

[6]K.S.A. 8-1523.

subsequent actions were appropriate in purpose and scope. First, Maschmeier inquired into whether there were circumstances explaining or mitigating the apparent traffic violation. He asked defendant why he did not pass the other truck; and he noted that defendant's response that he did not have enough time was not accurate. At this point, Maschmeier's reasonable suspicion of the traffic violation ripened into probable cause of the traffic violation.[7]

Secondly, Sergeant Maschmeier's inquiry into defendant's travel plans was appropriate, as was obtaining defendant's driver's license and vehicle documents for a records check. An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation.[8] An officer may also "ask questions about the motorist's travel plans and authority to operate the vehicle" in addition to obtaining the relevant documentation.[9] Beyond these specific questions, the Tenth Circuit has held that, in light of *Muehler v. Mena*,[10] as long as the officer's questioning does not extend the length of the detention, there is no Fourth Amendment issue with respect to the content of the questions.[11] Sergeant Maschmeier's questioning did not extend the length of the detention. From the inception of the stop until he returned the documents to defendant, only fifteen minutes transpired. Once the purpose of the stop is satisfied, however, the driver's detention must end

---

[7]See *United States v. Worthon*, 520 F.3d 1173, 1180 (10th Cir. 2008) (considering whether actions of trooper contributed to following too closely); *United States v. Vercher*, 358 F.3d 1257 (10th Cir. 2004) ("K.S.A. § 8-1523(a) establishes that the danger of following too closely is manifested by the distance between vehicles, with due regard for the speed, road, and traffic conditions");*United States v. Gregory,* 79 F.3d 973, 978-79 (10th Cir. 1996) (listing circumstances and facts that determine whether a stop for a lane violation was supported by reasonable suspicion); *United States v. Hunter*, No. 09-40084-JAR, 2010 WL 1758248, at *4-5 (D. Kan. Apr. 30, 2010).

[8]*See United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001).

[9]*United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006).

[10]544 U.S. 93 (2005).

[11]*Alcaraz-Arellano*, 441 F.3d at 1258; *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005).

9

without undue delay.[12]  Here, the detention ended at the fifteen minute mark, when Maschmeier returned all of defendant's documents to him.  At this point, their encounter became consensual.

*Consensual Encounter*

After the purpose of a traffic stop is complete, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible.[13]  In general, prolonging the detention for further questioning beyond that related to the initial stop is permissible in two circumstances: (1) if the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) if the initial detention has become a consensual encounter.[14]

Defendant argues that the encounter did not become consensual upon the return of his documents.  But "[a] traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority."[15]  The Tenth Circuit follows a "bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned."[16]

Here, Sergeant Maschmeier handed the documents back to defendant, and orally warned him to keep a safe distance behind other vehicles.  After defendant acknowledged that he would drive safely, Maschmeier began to step down and close the passenger door, then asked

---

[12]*United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006).

[13]*United States v. Bradford*, 423 F.3d 1149, 1156-57 (10th Cir. 2005).

[14]*United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

[15]*United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

[16]*Bradford*, 423 F.3d at 1158.

defendant, "knowing you are free to go, would you mind answering a few more questions?" Defendant responded yes. Maschmeier then went on to ask him if he had narcotics, weapons, contraband or large amounts of money, and defendant responded no. Maschmeier then asked if he could search the truck, and defendant assented. Maschmeier told defendant to get out of the truck, and then asked him for permission to pat him down for weapons, before doing so. Maschmeier then told defendant to stand in front of the truck while he searched the cab.

Defendant contends that the encounter was not consensual at this point. Defendant argues that there was a coercive environment, with a show of police authority, that negates any consensual nature of the encounter. Defendant points to the fact that Sergeant Maschmeier was armed and in uniform, that Maschmeier restricted defendant's movements by telling him to stand in front of the truck, and that Maschmeier patted defendant down for weapons as soon as defendant exited the truck. At this point, however, there was no show of authority or coercive environment evidencing a detention. Maschmeier was the only law enforcement officer present during the initial search of the cab; although he patted defendant down, he first asked for permission to pat him down. This is akin to a security officer asking an airline passenger for permission to do so. There is no evidence that Maschmeier brandished or even touched his weapon, or otherwise engaged in any show of force.

Once Corporal Coffman arrived, and as Sergeant Maschmeier expanded the search to the trailer, defendant was in the constant presence of a law enforcement officer. When a third law enforcement officer arrived, Coffman commenced his search of the cab, while the trooper stayed with defendant. At this point, a reasonable person in defendant's shoes might well have considered themselves as not free to go. But, at this point, there was reasonable suspicion

supporting the continued detention of defendant and the continued search of the vehicle.

By the time Corporal Coffman began his search of the cab, Sergeant Maschmeier knew or observed the following facts, which gave him reasonable suspicion: (1) defendant had exhibited extreme nervousness in the initial questioning concerning his travel plans; (2) defendant's extreme nervousness continued when Maschmeier asked for permission to search the cab; (3) defendant was not nervous and in fact exhibited relief when asked for permission to search the trailer; (4) nothing had been found in Maschmeier's search of the trailer; (5) although Maschmeier had not found anything in his initial search of the cab, it was not a thorough search and Maschmeier intended to conduct a more thorough search; (6) defendant's travel plans were suspect, as he had originated in Phoenix, gone to southern California and was en route to Georgia, yet was on Interstate 70, a northern transcontinental route, allegedly to spend a couple of hours in Denver with his sick father; (7) defendant had spent two days at a truck stop known as a situs of drug trafficking, despite the fact that he resided forty-five minutes from there; and (8) defendant had acquired the truck recently, given its high Department of Transportation registration number and the "ghosting" of the former company's name on the trailer, yet had sufficient funds to buy new tires, and other more cosmetic items for the truck. To the extent the encounter was no longer consensual by the time Maschmeier began his search of the cab, there was reasonable suspicion justifying the search of the cab, the trailer and the second, more thorough search of the cab.

This reasonable suspicion then ripened into probable cause when Corporal Coffman and Sergeant Maschmeier observed the apparent difference in ceiling and roof height of the cab, indicating a void, augmented by their observation of fresh tool marks on the ceiling panel, all

12

evidencing the presence of a hidden compartment. "It is well established that evidence of a hidden compartment can contribute to probable cause to search."[17] The Tenth Circuit uses a two-factor test to determine whether evidence of a hidden compartment, by itself, is sufficient to establish probable cause: (1) the likelihood that there really is a hidden compartment; and (2) the likelihood that a vehicle with a hidden compartment would, under the circumstances, be secreting contraband.[18] In this case, the first factor was met when the officers observed the disparity in the ceiling height and the roof height of the cab, which Maschmeier testified was strongly suggestive of a hidden compartment. The officers also observed that the screws holding the ceiling panel had fresh tool marks. The second factor was established by the many other facts that had formed Maschmeier's reasonable suspicion: defendant's demeanor and travel plans, the recent acquisition of the truck and the observed cosmetic upgrades to the truck. Probable cause to search a vehicle is established if under the totality of the circumstances there is a fair probability that the car contains contraband or evidence;[19] and, an officer may draw inferences based on his own experiences.[20]

Moreover, defendant gave Sergeant Maschmeier consent to multiple actions at multiple times. Maschmeier asked for and received defendant's consent to: (1) ask him questions, after Maschmeier had returned the documents to defendant; (2) pat defendant down; (3) search the cab; and (4) search the trailer. For the same reasons described above, the Court finds that the consents were freely and voluntarily given. Although defendant complains about the fact that

---

[17] *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004) (citing cases).

[18] *Id.*

[19] *United States v. Nielsen*, 9 F.3d 1487, 1489-90 (10th Cir. 1993).

[20] *United States v. Mercado,* 307 F.3d 1226, 1230 (10th Cir. 2002).

13

five law enforcement officers ultimately showed up at the scene, notably, he gave the above described consents while only Maschmeier was on the scene, before any other officers arrived.

Language barriers are relevant in evaluating a defendant's ability to act knowingly, intelligently, and voluntarily.[21] Although defendant suggests that his consent was not voluntary because there was no written consent form, he is not fluent in English and there was no interpreter available, the Court credits the testimony of Sergeant Maschmeier that defendant had no trouble with communicating with him, speech or comprehension.

Defendant also argues that he was not advised that he could refuse or withdraw consent, and the fact that he is not a United States citizen may have rendered him confused about whether he had a right to refuse consent. But the Tenth Circuit has "reject[ed] the suggestion that the officer's failure to advise [defendant] that he was free to leave, or that he could refuse consent to search, render[s] the consent involuntary."[22]

A "court determines from the totality of the circumstances whether a search remains within the boundaries of the consent, viewing the evidence in the light most favorable to the government."[23] "The general rule is that where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle."[24] Nevertheless, even if defendant had sought to limit or stop the search after having specifically consented to a search of the cab and then a search of the trailer, the officers had probable cause to search the cab, including the ceiling area,

---

[21]*United States v. Hernandez*, 893 F. Supp. 952, 961 (D. Kan. 1995), *aff'd*, 103 F.3d 145 (10th Cir. 1996).

[22]*United States v. Gregoire*, 425 F.3d 872, 880 (10th Cir. 2005).

[23]*United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000).

[24]*Id.*; *United States v. Jackson*, 381 F.3d 984, 988 (10th Cir. 2004).

once they observed the alterations and associated them with false compartments.

## III. Conclusion

For all of the above reasons, the Court concludes that the traffic stop was valid, and the search of the truck was based on defendant's voluntary consent; that even absent consent, once Sergeant Maschmeier returned defendant's documents, he had reasonable suspicion to continue inquiry and investigation, including searching the cab and trailer; and that reasonable suspicion ripened into probable cause once Sergeant Maschmeier and Corporal Coffman observed an apparent void, fresh tool marks on the bolts of a panel and the presence of a hidden compartment.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion to Suppress (Doc. 20) is DENIED.

**IT IS SO ORDERED.**

Dated: March 30, 2011

                                                S/ Julie A. Robinson
                                                JULIE A. ROBINSON
                                                UNITED STATES DISTRICT JUDGE